2002 ND 201

**Marvin WANNER, Claimant and Appellant,**

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU, Appellee.**

No. 20020080.

Supreme Court of North Dakota.

Dec. 20, 2002.

Steven L. Latham (argued), Wheeler Wolf, Bismarck, ND, for claimant and appellant.

Lawrence E. King (argued), Special Assistant Attorney General, Bismarck, ND, and Lawrence A. Dopson (on brief), Special Assistant Attorney General, Bismarck, ND, for appellee.

MARING, Justice.

[¶ 1] Marvin Wanner appealed a judgment affirming a North Dakota Workers Compensation Bureau order adopting an administrative law judge's recommended order that Wanner forfeit all additional workers compensation benefits after December 22, 1999, in connection with his 1988 work injury. We hold the Bureau's finding that Wanner willfully made a material false statement in connection with his claim is not supported by a preponderance of the evidence. We reverse and remand for reinstatement of benefits and payment of accrued benefits erroneously terminated.

I

[¶ 2] Wanner injured his back while employed as a truck driver on September 20, 1988. The Bureau accepted liability and paid medical expenses and disability benefits. While receiving disability benefits, Wanner sold vegetables he raised in a garden which "might be 55 or 60 wide" and "maybe 60 feet long" and occasionally drove a farm truck hauling grain for friends during harvest. In 1999, the Bureau asked a private investigator to conduct surveillance of and investigate Wanner's activities because it had received information Wanner was doing physical labor. In a December 15, 1999, order, the Bureau found, among other things, that Wanner maintained a garden, received money for vegetables, and performed harvest activities for a friend while receiving disability benefits, which he failed to report and about which he willfully made false statements. The Bureau ordered Wanner to repay $6,678.51, and ordered that he "forfeit all additional workers' compensation benefits in connection with this claim after December 22, 1999."

[¶ 3] Wanner requested a rehearing. After a hearing, an administrative law judge ("ALJ") issued recommended findings of fact, conclusions of law, and order. Considering an injured worker status report Wanner completed on August 31, 1999, the ALJ found: "The plain and certain statements made by Wanner to the Bureau upon the completion and submission of the report were that he had not done any type of work and that he had not received money from any source except the Bureau and the Social Security Administration."

[¶ 4] With regard to the issue of whether Wanner misrepresented his work activities concerning his garden and money received therefrom, the ALJ found:

15. . . . Considering the question posed by the report concerning work activities (Have you gone back to work, or done any type of work for pay or not?), in the context of Wanner's need to be busy, to have something to do, it is clear that for the work done in his garden Wanner would not think that he had gone back to work or even done any type of work . . . .

16. Wanner does not dispute, however, that his garden was a source of money; as he put it, "a few dollars I get from garden veggies . . . to help cover . . . [the costs of] seed . . . water for [the] garden.["] . . . But there is little evidence to suggest that Wanner planned a garden to produce vegetables for sale; rather it is more likely than not that his garden was the result of the absence of any planning and the lack of any thought for the use of the vegetables which his efforts would produce . . . .

20. . . . Regardless, he was unequivocally instructed and advised by the Bureau for the completion of the report that he "must report any money received from work, activities, or services

of any kind, regardless of profit or loss.["]

[¶ 5] With regard to the issue of whether Wanner misrepresented his work activities concerning his hauling grain for a farm family, the Rollers, the ALJ found:

> 23. The Bureau also contends that Wanner worked for a farm family, "the Rollers," hauling grain during harvest. The ... greater weight of evidence shows that Wanner has helped out the Rollers at least six to eight times a year during harvest over a period of three or four years, 1996 through 1999, depending upon how one counts. He would usually come out to the farm around noon after harvesting had begun, and would take a truck loaded with grain from the field to the farmstead where it would be placed in a bin for storage, or sometimes the grain would be hauled to a nearby town to be sold at the elevator....
>
> Wanner does not deny that he helped the Rollers during harvest by hauling grain, but notes that the family members were his friends and that he was not paid for his help. He explains that he did not consider his help to be work, rather, he testified, "what I would call having fun, being productive again, being able to do something I used to do, drive a truck."

The ALJ recommended the following conclusions of law:

> 5. [T]he evidence does show, indeed is overwhelming, that for the work done in his garden Wanner would not think, in the words of the Bureau's question, that he had "gone back to work or done any type of work" in his garden—even considered in the context of the Bureau's instruction and advice for the completion of the report that "you must accurately report work of any kind ... that you do."
>
> ....
>
> 7. ... Wanner's assistance to the Rollers is clearly within the Bureau's instruction and advice for the completion of the report ("work of any kind (voluntary, part-time, or full-time) that you do, whether you are paid or not") and the Bureau's question ("Have you gone back to work, or done any type of work for pay or not?").... By his negative response on August 31, 1999, to the Bureau's question whether he had "gone back to work, or done any type of work for pay or not" Wanner willfully made a false statement within the meaning of N.D.C.C. § 65–05–33 in connection with his claim for workers' compensation benefits.
>
> 8. Considered in the context of the circumstances, the greater weight of the evidence establishes that Wanner intentionally failed to report the money received for the sale of vegetables from his garden.... By his representation to the Bureau that other than the Bureau he had received money only from "Social Security," Wanner willfully made a false statement within the meaning of N.D.C.C. § 65–05–33 in connection with his claim for workers' compensation benefits.
>
> 9. ... There is neither any testimony or other evidence which shows or which would support an inference that the Bureau has paid any amount of benefits in error because of Wanner's failure to report his work to assist the Rollers for their harvest or because of his failure to report the money he received for the sale of vegetables from his garden....
>
> Upon the evidence of record and in accordance with the instruction of the Supreme Court for the application of N.D.C.C. § 65–05–33 Wanner may not be required to reimburse the Bureau for any benefits which the Bureau has paid

him, but he shall forfeit any additional benefits.

[¶ 6]   The ALJ issued a recommended order providing "Wanner made false statements concerning work which he did and money which he received, that those false statements were willful and intentional . . . and could have misle[]d the Bureau for the determination of options for his rehabilitation and entitlement to benefits and were therefore material." The ALJ further recommended forfeiture of all additional benefits in connection with Wanner's September 20, 1988, injury, and that the Bureau could not obtain reimbursement for benefits already paid.

[¶ 7]   On August 17, 2001, the Bureau issued an order adopting the ALJ's recommended findings, conclusions, and order. Wanner appealed to the district court, which affirmed the Bureau's decision. Wanner appealed to this Court.

II

[¶ 8]   In an appeal from an administrative agency decision, we review the decision of the administrative agency, rather than that of the district court, although the district court's analysis is entitled to respect. *Paul v. North Dakota Workers Comp. Bureau,* 2002 ND 96, ¶ 6, 644 N.W.2d 884.   Under N.D.C.C. §§ 28–32–46 and 28–32–49, we affirm an agency's order unless (1) the order is not in accordance with the law; (2) the order violates the appellant's constitutional rights; (3) the provisions of N.D.C.C. ch. 28–32 have not been complied with in the agency's proceedings; (4) the agency's rules or procedure have not afforded the appellant a fair hearing; (5) the agency's findings of fact are not supported by a preponderance of the evidence; (6) the agency's conclusions of law and order are not supported by its findings of fact; (7) the agency's findings of fact do not sufficiently address

the evidence presented by the appellant; or (8) the agency's conclusions of law and order do not sufficiently explain its rationale for not adopting any contrary recommendations by a hearing officer or administrative law judge.   We exercise restraint in deciding whether or not an agency's findings of fact are supported by a preponderance of the evidence; we do not make independent findings or substitute our judgment for that of the agency, but, instead, we decide whether a reasoning mind reasonably could have decided the agency's findings were proven by the weight of the evidence from the entire record. *Paul,* at ¶ 6. Questions of law, including statutory construction, are fully reviewable on appeal. *Id.*

III

[¶ 9]   Wanner contends the Bureau erred in using a "preponderance of the evidence" standard of proof, rather than a "clear and convincing" standard of proof in determining he made false statements in violation of N.D.C.C. § 65–05–33. A similar contention was recently rejected in *Sjostrand v. North Dakota Workers Comp. Bureau,* 2002 ND 125, 649 N.W.2d 537.   A majority of this Court (Maring, J., dissenting) held "the Bureau's findings under N.D.C.C. § 65–05–33 must be affirmed if they are supported by a preponderance of the evidence." *Id.* at ¶ 30.   We need not revisit that issue in this appeal, because, under either standard of proof, the Bureau did not prove Wanner willfully made a material false statement justifying forfeiture of future benefits under N.D.C.C. § 65–05–33.

IV

[¶ 10]   Wanner contends "[t]he Bureau erred in accepting and relying on the investigation and testimony of its private investigator Don Schneider."   Wanner ar-

gues the video surveillance of his activities at his residence and the investigator's "deceitful and misrepresentative conduct when he presented himself at Wanner's door, misrepresented his identity and the purpose of his visit, and attempted to induce Wanner into certain activities" violated his "individual right of privacy, which is founded in the 14th Amendment's concept of personal liberty." Wanner contends that, without the investigator's testimony and report, there is no evidence to support the Bureau's findings and conclusions.

■ [¶ 11] The surveillance and deception of which Wanner complains were directed at his failure to report his gardening activities as work and his failure to report the receipt of money from gardening. The Bureau did not find· Wanner failed to report work in connection with his gardening. Although an injured worker status report of August 31, 1999, required him to disclose the receipt of money from any source other than the Bureau, Wanner reported only the receipt of money from Social Security and not from the sale of vegetables. However, we conclude Wanner's failure to report the receipt of money from the sale of vegetables was not material. Thus, we need not determine if the intrusive surveillance of Wanner's residence and the investigator's deceptive conduct in this case violated Wanner's right to privacy.[1] Anything we might say "on this issue would only amount to an advisory opinion. We do not give advisory opinions." *Ritter, Laber & Assocs., Inc. v. Koch Oil, Inc.,* 2000 ND 15, ¶ 30, 605 N.W.2d 153.

V

■ [¶ 12] Wanner contends the Bureau erred in finding he "willfully made false statements regarding income from his vegetable garden."

[¶ 13] When the Bureau first ordered repayment and forfeiture in 1999, N.D.C.C. § 65–05–33 provided, in part:

1. A person is guilty of a class A misdemeanor if that person is claiming benefits or payment for services under this title, and that person:

a. Willfully files a false claim or makes a false statement.

b. Willfully misrepresents that person's physical condition, including deceptive conduct which misrepresents that person's physical ability.

c. Has a claim for disability benefits that has been accepted by the bureau and willfully fails to notify the bureau of:

(1) Work or other activities as required under subsection 3 of section 65–05–08;

(2) The receipt of income from work; or

(3) An increase in income from work.

. . . .

3. In addition to any other penalties provided by law, the person claiming benefits or payment for services in violation of this section shall reimburse the bureau for any benefits paid based upon the false claim or false statement and, if applicable, under section 65–05–29 and shall forfeit any additional benefits relative to that injury.

[¶ 14] Wanner argues, among other things: (1) "If the Bureau has concluded that Wanner's activities in his vegetable garden did not constitute work, then its

---

1. We note, however, that N.D.C.C. § 65–05–08(3) states " 'work' does not include routine daily activities of self-care or family care, or routine maintenance of the home and yard." Accordingly, it is difficult to understand the need or relevance of such intrusive surveillance as took place in this case.

finding that he willfully failed to report receipt of income from work, as required under subsection 3 of Section 65–05–33, is not supported by the evidence and is contrary to the law;" (2) "The monies Wanner received for the vegetables in his garden did not even cover the cost of raising the vegetables, let alone receipt of income from work;" and (3) "Wanner's acceptance of money from those who offered him money for his vegetables was not income from work that he was required to report to the Bureau."

[¶ 15]   Section 65–05–33, N.D.C.C., addresses false statements to secure benefits and a failure to report income from work or a failure to notify the Bureau of "[w]ork or other activities as required under subsection 3 of section 65–05–08." In 1999, N.D.C.C. § 65–05–08(3) imposed advisory requirements upon the Bureau and reporting requirements upon injured employees:

3.   Any employee who is eligible for, or receiving disability or rehabilitation benefits under this title shall report any wages earned, from part-time or full-time work from any source. If an employee fails to report wages earned, the employee shall refund to the bureau any disability or vocational rehabilitation benefits overpaid by the bureau for that time period. To facilitate recovery of those benefits, the bureau may offset future benefits payable, under section 65–05–29. If the employee willfully fails to report wages earned, the employee is subject to the penalties in section 65–05–33. An employee shall report whether the employee has performed work or received wages. The bureau periodically shall provide a form to all injured employees receiving disability or rehabilitation benefits which the injured employee must complete to retain eligibility for further dis-

ability or rehabilitation benefits, regardless of the date of injury or claim filing. The form will advise the injured employee of the possible penalties for failure to report any work or activities as required by this section. An injured employee who is receiving disability or vocational rehabilitation benefits must report any work activities to the bureau whether or not the injured employee receives any wages. An injured employee who is receiving disability or vocational rehabilitation benefits also must report any other activity if the injured employee receives any money, including prize winnings, from undertaking that activity, regardless of expenses or whether there is a net profit. For purposes of this subsection, "work" does not include routine daily activities of self-care or family care, or routine maintenance of the home and yard, and "activities" does not include recreational gaming or passive investment endeavors.

[¶ 16]   Section 65–05–08(8), N.D.C.C., allows an injured employee to earn up to ten percent of his preinjury average gross weekly earnings without a reduction in benefits:

8.   The bureau may not pay disability benefits unless the loss of earning capacity exceeds ten percent. The injured employee may earn up to ten percent of the employee's preinjury average gross weekly earnings with no reduction in total disability benefits. The employee must report any earnings to the bureau for a determination of whether the employee is within the limit set in this subsection.

[¶ 17] Section 65–05–08(3), N.D.C.C., requires the Bureau to provide reporting forms to injured employees and requires the Bureau to provide a reporting form that "will advise the injured employee of the possible penalties for failure to report any work or activities as required by this section." The injured worker status report form the Bureau supplied to Wanner, which he completed on August 31, 1999, and which is the basis for the ALJ's recommendations and the Bureau's order in this case, contains but two sentences related to this penalty advice requirement: (1) "Failure to report any type of work, wages, or other money received, may be a violation of law;" and (2) "I understand the nature of the questions asked in this status report and further understand that providing false information may be a crime, punishable by substantial fines and imprisonment, or both." Those opaque and unilluminating passages clearly do not advise an injured employee of the possible penalties of reimbursement of benefits paid or forfeiture of all future benefits under N.D.C.C. § 65–05–33 that may result from failure to report any work or activities required by N.D.C.C. § 65–05–08(3), and, therefore, do not provide the notice of penalties required by N.D.C.C. § 65–05–08(3).

[¶ 18] "To trigger the statutory consequences of N.D.C.C. § 65–05–33, for a false claim or statement, the Bureau must prove a claimant willfully made a material false claim or statement in connection with a claim or application under Title 65, N.D.C.C." *Snyder v. North Dakota Workers Comp. Bureau*, 2001 ND 38, ¶ 16, 622 N.W.2d 712. "To be willful, conduct must be engaged in intentionally, not inadvertently." *Id.* The injured worker status report form completed by Wanner advised him he "must report any money received from work, activities, or services of any kind, regardless of profit or loss." There is no dispute Wanner received money from the sale of vegetables from his garden, failed to disclose the receipt of such money on the form, and reported he had not received money from any source except the Bureau and Social Security. The Bureau could reasonably conclude Wanner willfully made a false statement within the meaning of N.D.C.C. § 65–05–33.

## VI

[¶ 19] Wanner contends, however, that he did not make a "material" false statement justifying forfeiture of future benefits. We apply a materiality test to false claims or statements under N.D.C.C. § 65–05–33. *F.O.E. Aerie 2337 v. North Dakota Workers Comp. Bureau*, 464 N.W.2d 197, 200–01 (N.D.1990). There are two materiality tests:

If the Bureau seeks reimbursement for benefits paid, the level of materiality required is proof by the Bureau that the false claim or false statement caused the benefits to be paid in error. *Hausauer*, 1997 ND 243, ¶ 17, 572 N.W.2d 426. However, if the Bureau is seeking only forfeiture of future benefits, as in Jacobson's case, no such causal connection is required. *Id.* A false claim or false statement is sufficiently material for forfeiture of future benefits if it is a statement which could have misled the Bureau or medical experts in a determination of the claim. *Vernon v. North Dakota Workers Comp. Bureau*, 1999 ND 153, ¶ 13, 598 N.W.2d 139.

*Jacobson v. North Dakota Workers Comp. Bureau*, 2000 ND 225, ¶ 10, 621 N.W.2d 141.

[¶ 20] While the testimony about the amount of money Wanner received for the sale of vegetables and did not report on the August 31, 1999, status report is im-

precise, the total testified to falls within a range of $129 to $160, $40 of which was reported on September 26, 1999. The Bureau found the false statement was not material with regard to the medical expenses and compensation already paid, and, therefore, Wanner was not required to repay any benefits paid. However, the Bureau found the false statement about "money which he received … could have misle[]d the Bureau for the determination of options for his rehabilitation and entitlement to benefits and [] therefore material" and ordered forfeiture of all additional benefits in connection with Wanner's 1988 injury, which Bureau counsel acknowledged at oral argument will likely exceed the amount of benefits already paid.

[¶ 21] We have said a failure to report "income" may justify forfeiture of future benefits:

> A failure to report income is, by the very nature of the violation, material to the Bureau's ability to determine a claimant's entitlement to benefits and to calculate the amount of benefits. By failing to report income a claimant impedes the Bureau's process of determining eligibility. The Bureau's finding that Unser intentionally failed to report income supports its conclusion Unser's violation was material and justifies forfeiture under N.D.C.C. § 65–05–33(2) of future disability benefits connected to the 1990 claim.

*Unser v. North Dakota Workers Comp. Bureau*, 1999 ND 129, ¶ 18, 598 N.W.2d 89. We followed *Unser* in *Snyder v. North Dakota Workers Comp. Bureau*, 2001 ND 38, ¶¶ 17, 18, 622 N.W.2d 712. However, "[a] decision's precedential value is measured by the context of its particular facts." *In re C.R.M.*, 552 N.W.2d 324, 326 (N.D.1996). *Unser* involved a failure to report income from carpentry work. *Snyder* involved a failure to report income

from work activities in a restaurant. *Unser* and *Snyder* have no precedential value with regard to a failure to report money from "activities." With regard to not reporting income, *Unser* and *Snyder* stand only for the propositions that (1) a failure to report income from work is material to the Bureau's ability to determine a claimant's entitlement to benefits and to calculate the amount of benefits, and (2) by failing to report income from work, a claimant impedes the Bureau's process of determining eligibility. Section 65–05–08(8), N.D.C.C., specifically addresses eligibility for disability benefits in terms of earnings. ("The injured employee may earn up to ten percent of the employee's preinjury average gross weekly earnings with no reduction in total disability benefits." N.D.C.C. § 65–05–08(8)). The clear import of the statute is that earnings are income from work. In addition, in determining eligibility for rehabilitation services under N.D.C.C. § 65–05.1–01(3) the "income test" of "ninety percent of the employee's average weekly earnings at the time of injury, or to sixty-six and two-thirds percent of the average weekly wage in this state … whichever is less" is utilized. The Bureau concluded Wanner's gardening was not work. Money received from an activity not work is not material to eligibility for disability or rehabilitation benefits. "Earnings" are not defined in the Workers Compensation Act. Words are to be understood in their ordinary sense if not defined in a statute. N.D.C.C. § 1–02–03. The definition of "earnings" from Merriam Webster's Collegiate Dictionary is "1: something (as wages) *earned* 2: the balance of revenue after deduction of costs and expenses.". Merriam–Webster Online Collegiate Dictionary (2002), http://www.m-w.com/cgi-bin/dictionary. The commonly understood definition of "earn" is "1a: to receive as return for effort and especially for work done or services rendered." *Id.*

Thus, the Bureau's reliance on *Unser* and *Snyder* to establish materiality based on Wanner's failure to report the receipt of money from the sale of vegetables resulting from his gardening activities, which the Bureau found Wanner "would not think" was work, is misplaced. In addition, the Bureau found Wanner's sale of vegetables was "prompted not by a need or desire for money, but by the abundance of the vegetables he had produced." This is not a case where someone's hobby has turned into a livelihood or work. We are not persuaded Wanner's failure to report the receipt of $129 to $160 from the sale of vegetables was a material false statement justifying forfeiture of all future benefits for his 1988 injury. While a failure to report income from work is material to the Bureau's ability to determine a claimant's entitlement to benefits and to calculate the amount of benefits, a failure to report money received apart from work is not similarly material. It is not disputed that the ALJ did not find it material to payment of disability benefits. *See* conclusion of law 9 quoted in ¶ 5. There is no evidence in the record that a minimal amount of money from a hobby is material to eligibility for any type of benefit. We conclude a reasoning mind could not reasonably find, as the Bureau did, that Wanner's failure to report the receipt of a minimal amount of money apart from work "could have misle[]d the Bureau for the determination of options for his rehabilitation and entitlement to benefits and [] therefore material."

### VII

[¶ 22] On the injured worker status report Wanner completed on August 31, 1999, he marked a box indicating he had not "gone back to work, or done any type of work for pay or not." In conclusion of law number seven, the Bureau found that Wanner assisted a farm family,

the Rollers, during harvest for three or four years by driving a truck to haul grain and that, "[b]y his negative response on August 31, 1999, to the Bureau's question whether he had 'gone back to work, or done any type of work for pay or not' Wanner willfully made a false statement within the meaning of N.D.C.C. § 65–05–33 in connection with his claim for workers' compensation benefits."

[¶ 23] Neither the Bureau nor the legislature has defined work. *Snyder v. North Dakota Workers Comp. Bureau,* 2001 ND 38, ¶ 12, 622 N.W.2d 712; *Jacobson v. North Dakota Workers Comp. Bureau,* 2000 ND 225, ¶ 15 n. 1, 621 N.W.2d 141. While N.D.C.C. § 65–05–08(3) requires an injured employee to report, among other things, "work" and "work activities" to the Bureau, it does not define either term, although the last sentence does, somewhat imprecisely, list some things that are not included. Under N.D.C.C. § 1–02–02, "words not defined in a statute are to be understood in their ordinary sense." *Jacobson,* ¶ 15 n. 1. In other cases involving questions of "work," we have held activities were work in the ordinary sense or by common understanding. *See Jacobson,* at ¶ 15 ("Based on the common understanding of work . . . entering as a professional in major fishing tournaments, representing Twin City Marine at boat shows, assisting on the sales floor, accepting entrance fees paid for by Twin City Marine, and buying a new boat each season at a discounted price" constituted work activity.); *Snyder,* at ¶ 12 (Opening a restaurant at 5:00 a.m. daily and staying until 7:00 a.m., baking rolls, turning on the grill, making coffee, signing receipts for deliveries, cooking and serving meals to customers, collecting money at the cash register, picking up supplies, and performing maintenance work, constituted work in its ordinary sense, as a matter of law.).

Both of those cases involved activities that were much more clearly "work" than we have in this case and the claimants in those two cases were paid for the work activities involved.

[¶ 24] Wanner does not dispute he hauled grain for the Rollers, but contends it was not work required to be reported. He argues:

> Most people, like Wanner, consider work to be in the context of an employer-employee relationship where there are certain expectations of an employer toward his employee. Wanner's situation at the Roller farm clearly did not meet that. The Bureau's income and work status cards clearly refer to work and income. Wanner did not receive any pay from the Rollers and there was no expectation from the Rollers. There is nothing to give an individual such as Wanner any idea that the Bureau is seeking information about one's activities other than the commonly understood work situation where someone is in someone else's employment, whether getting paid or not.
>
> Wanner's activity at the Roller farm was to be with friends, to keep himself busy, and a form of therapy. Wanner has never understood his putzing around to be considered work, nor would a normal person consider such activity to be work. Section 65–05–08(3) only requires that someone must report any work activities to the Bureau, whether or not the injured worker receives any wages.

[¶ 25] Resort to a few textual references lends support to Wanner's argument. Black's Law Dictionary (7th ed.1999) defines "work" as "1. Physical and mental exertion to attain an end, esp. as controlled by and for the benefit of an employer; labor." The same dictionary defines "employer" as "A person who controls and directs a worker under an ex-

press or implied contract of hire and who pays the worker's salary or wages." The same dictionary defines "labor" as "1. Work of any type, including mental exertion <the fruits of one's labor>. *The term usu. refers to work for wages as opposed to profits." Merriam–Webster's Collegiate Dictionary defines "work": "1: activity in which one exerts strength or faculties to do or perform something: a: sustained physical or mental effort to overcome obstacles and achieve an objective or result b: the labor, task, or duty that is one's accustomed means of livelihood c: a specific task, duty, function, or assignment often being a part or phase of some larger activity." Merriam Webster Online Collegiate Dictionary (2002), http://www.m-w.com/cgi-bin/dictionary. Cambridge International Dictionary of English defines "work" as "an activity, such as a job, in which a person uses their body and/or their mind to make or do something, usually for money, or the material used or what is produced." Cambridge International Dictionary of English (2002), http://dictionary.cambridge.org/define.asp?key=work*1+0. The American Heritage Dictionary of the English Language (4th ed.2000) defines "work": "1. Physical or mental effort or activity directed toward the production or accomplishment of something. 2a. A job; employment: *looking for work.* b. A trade, profession, or other means of livelihood." The American Heritage Dictionary of the English Language (4th ed.2002), http://www.bartleby.com/61.

[¶ 26] Moving from lexicographic texts to relevant legislative texts, we find additional support for Wanner's argument. Section 65–01–01, N.D.C.C., "declares that the prosperity of the state depends in a large measure upon the wellbeing of its wage workers, and, hence, for workers injured in hazardous employments ... sure

and certain relief is hereby provided." With exceptions not relevant to this case, N.D.C.C. § 65–01–02(22) in 1999 defined "hazardous employment" as "any employment in which one or more employees are employed regularly in the same business or in or about the establishment." Section 65–01–02(17), N.D.C.C., in 1999 defined an employee as "a person who performs hazardous employment for another for remuneration," specifically included specified groups of people, and specifically excluded "[a]ny person whose employment is both casual and not in the course of the trade, business, profession, or occupation of that person's employer." Section 65–01–02(18), N.D.C.C., in 1999 defined an "employer" as "a person who engages or received the services of another for remuneration unless the person performing the services is an independent contractor under the 'common law' test." Section 65–01–02(31), N.D.C.C., in 1999 defined "wages" as "an employee's remuneration from all employment reportable to the internal revenue service as earned income for federal income tax purposes." In *Kipp v. Jalbert*, 110 N.W.2d 825, 829 (N.D.1961), this Court said a carpenter helping a farmer dismantle a barn and build a garage, which was "incidental and an isolated, exceptional, and temporary activity of the employer" not "characterized as permanent or periodically regular," occurring "by chance," and of "limited duration" was "casual employment."

[¶ 27] Absent a statutory or administrative definition of "work," in light of the legislative purpose of the workers compensation act to provide sure and certain relief to wage workers injured in hazardous employments and in light of the foregoing dictionary and statutory references, we conclude an ordinary person not steeped in the arcane mysteries of the workers compensation laws as construed and administered by the Bureau would reason-

ably expect to have to report as work only activities performed in regular employment by others for remuneration, or showing an ability to regularly perform a gainful occupation, and would not ordinarily expect to have to report casual activities not done for remuneration and not performed for an employer.

[¶ 28] Wanner testified (1) he would go out to Rollers' farm at harvest to haul grain "whenever I felt like it, and what I would call have fun, being productive again, being able to do something I used to do, drive a truck while they were combining;" (2) he did not think it was work he had to report to the Bureau, because "I wasn't getting paid. It was no job;" (3) the truck was a "small farm truck" and was "[a] pretty smooth truck;" (4) he did not "have any difficulties in operating it or driving it ... that little short distance and in that small of a little truck;" and (5) hauling grain was "very good therapy and making me feel like a human being being able to do something."

[¶ 29] Kathleen Roller testified:

He would come out usually after noon just because by the time we got going, that would be when the first trucks were full. He would sit in the truck until a truck was full and then drive it back to the farmyard. Once it got into the yard, all of our elevators are set up with a hydraulic hookup to the augurs and all he had to do was turn on a tractor key and empty the grain. There was no physical labor involved. He didn't have to shovel. He didn't have to climb bins. We know Marv. We know what he can handle and we made sure that those kinds of things were taken care of.

She also testified they did not pay Wanner, he was not an employee, Wanner did it because "[h]e's been a good friend," and "[t]here were some days when he said I

just can't, I have a headache, I hurt too bad, or whatever, and those days he didn't come."

[¶ 30] In light of the lack of a statutory or administrative definition of work; the dictionary and statutory texts we have discussed; Kathleen Roller's testimony about accommodations they made so Wanner would not have to do any physical labor and that Wanner did not come to the farm when he had a headache or hurt too much; the lack of pay for Wanner's help; and Wanner's testimony he could haul grain "whenever I felt like it" and hauling grain was a way to "have fun" and be "productive again," was "very good therapy" which he did not consider work required to be reported to the Bureau, and which, in short, was, for Wanner, a sporadic, relatively easy, fun, therapeutic activity, we conclude a reasoning mind could not reasonably find, as the Bureau did, that "[b]y his negative response on August 31, 1999, to the Bureau's question whether he had 'gone back to work, or done any type of work for pay or not' Wanner willfully made a false statement within the meaning of N.D.C.C. § 65–05–33 in connection with his claim for workers' compensation benefits."

## VIII

[¶ 31] Wanner contends forfeiture of all future benefits in connection with his work injury denies him his right to sure and certain relief for his work injury. In light of our disposition of other issues, we need not address that issue.

## IX

[¶ 32] The judgment is reversed, and the matter is remanded for reinstatement of benefits and payment of accrued benefits erroneously terminated.

[¶ 33] WILLIAM A. NEUMANN, J., concur.

VANDE WALLE, Chief Justice, concurring in the result.

[¶ 34] I concur in the result reached by the majority opinion. Although I remain concerned about statements which could mislead the Bureau, *F.O.E. Aerie 2337 v. North Dakota Workers Comp. Bureau,* 464 N.W.2d 197, 201 (N.D.1990) (Vande Walle, J., concurring specially), *Hopfauf v. North Dakota Workers Comp. Bureau,* 1998 ND 40, ¶ 19, 575 N.W.2d 436 (Vande Walle, C.J., dissenting), it is unlikely Wanner's failure to disclose the fact he sold some vegetables from a vegetable garden could mislead the Bureau and, therefore, be material. Presumably the Bureau believes if one can maintain a garden one can be rehabilitated. Were that the case, the fallacy, of course, is that if Wanner raised a garden and sold no vegetables and had no income, there would be no obligation to report any income even though he maintained the garden. N.D.C.C. § 65–05–08(3) (excluding routine maintenance of home and yard from definition of work).

[¶ 35] The failure to disclose Wanner drove a truck on occasion is a greater problem, particularly since Wanner was driving truck when he incurred the injury for which he is receiving benefits. But, the uncontradicted testimony is that Wanner drove the truck only when he did not feel ill, and he did nothing besides drive the truck. Neither the statutes nor the administrative code contain a definition of work. "This means not only that the Bureau may not agree with the claimant but, without a definition in the statute or a rule, the Bureau takes the risk the courts will not agree with the Bureau's application of the term to particular facts." *Jacobson v. North Dakota Workers Comp. Bureau,* 2000 ND 225, ¶ 15 n. 1, 621 N.W.2d 141.

[¶ 36] It must be proven by a preponderance of the evidence that driving the

truck was "work." I have serious doubt it was, under the circumstances, work in the ordinary sense. Because of this doubt, coupled with the severe result of the forfeiture of all future benefits after December 22, 1999, I concur in the result reached by the majority opinion.

[¶ 37] GERALD W. VANDE WALLE, C.J., concurs.

NEUMANN, Justice, concurring.

[¶ 38] The absence of any definition of work in the statutes or in the administrative code raises due process questions. It seems inherently unfair to hold claimants to an unspecified standard of compliance in reporting their activities and then subject them to the risk of losing benefits if they fail to meet that unspecified standard. I believe the Bureau should tell claimants what constitutes "work" for the purposes of complying with N.D.C.C. § 65–05–08(3).

[¶ 39] WILLIAM NEUMANN, J., concurs.

SANDSTROM, Justice, dissenting.

[¶ 40] In *Unser v. N.D. Workers Compensation Bureau,* in an opinion authored by Justice Maring, this Court unanimously held:

A failure to report income is, by the very nature of the violation, material to the Bureau's ability to determine a claimant's entitlement to benefits and to calculate the amount of benefits. By failing to report income a claimant impedes the Bureau's process of determining eligibility.

*Unser,* 1999 ND 129, ¶ 18, 598 N.W.2d 89.

[¶ 41] Here, the Bureau specifically found that Wanner had failed to report income to the Bureau.

[¶ 42] The record clearly reflects that when asked to report whether he had "received money from *any* source other than from the Bureau," Wanner did not disclose the money received from the sale of vegetables.

[¶ 43] The Bureau found, as record testimony clearly supports, Wanner bragged to an undercover investigator that he did not report to the Bureau the money he received from the sale of vegetables: "Of course, I don't report any of the money from the vegetables to workers comp. either." Finding of Fact 21.

[¶ 44] The Bureau specifically concluded, "Considered in the context of the circumstances, the greater weight of the evidence establishes that Wanner intentionally failed to report the money received for the sale of vegetables from his garden."

[¶ 45] Based on the evidence presented, the Bureau concluded Wanner was selling "substantial quantities of vegetables."

[¶ 46] The majority, at ¶ 20, asserts that the total unreported amount testified to "falls within a range of $129 to $160." The Bureau made no such finding, and the transcript of the hearing before the Bureau (pp. 82, 85, and 86) reflects that Wanner himself testified to receiving from $256 to $266 from the sale of vegetables.

[¶ 47] The majority, at ¶ 21, characterizes the amount not reported as "minimal" and concludes it was not material.

[¶ 48] Clearly, our statutes do not reflect that the amount asserted by the majority or the larger amount admitted by Wanner are without legal significance. The smaller amount is legally significant, for example, under our theft statutes. *See* N.D.C.C. ch. 12.1–23. And our theft statutes recognize $250 as the amount raising a theft offense from a class B misdemeanor to a class A misdemeanor. N.D.C.C. § 12.1–23–05.

[¶ 49] It should also be remembered that the Bureau, when it found the "substantial" sales by Wanner, did not limit its findings to the amount admitted by Wanner. That Wanner sold more than he admitted is a reasonable inference from the evidence presented.

[¶ 50] Materiality of a misrepresentation is ordinarily a question of fact. *Southern Equipment & Tractor Co. v. K & K Mines, Inc.*, 272 Ark. 278, 613 S.W.2d 596 (1981). Here, the majority impermissibly substitutes its judgment for that of the fact-finder. If the materiality of the misrepresentation were a question of law, the Bureau's conclusion would be wholly supported by North Dakota law.

[¶ 51] Similarly, whether Wanner's truck driving was "work" is a question of fact permissibly decided by the Bureau.

[¶ 52] I agree with the reasoned opinion of the district court, which agreed with the Bureau that Wanner willfully failed to report income and work and the misrepresentations were material:

> As pointed out by the Bureau the Administrative Law Judge, hereafter "ALJ", made extensive findings relative to whether Wanner willfully failed to report income or work activities to the Bureau. Concerning the alleged failure to report to the Bureau his income from gardening activities the ALJ found credible and most damaging Wanner's statement to the Bureau's investigator that he had not been reporting such income. Concerning Wanner's work activities for the Rollers the ALJ found significant that some of his activities involved doing the same work Wanner used to do—driving truck.
>
> . . . .
>
> The ALJ carefully considered the evidence and had the opportunity to observe the witnesses and assess their credibility. The ALJ noted that Wanner acknowledged reading the monthly reports and did not claim he was confused or did not understand the instructions or advice for completing the forms or that his responses to the Bureau's questions were mistaken. After carefully considering the record, this Court finds there is substantial evidence from which a reasoning mind reasonably could have determined that Wanner willfully made false statements to the Bureau when he failed to report the income from the sale of his garden vegetables or his work activities at the Rollers.
>
> . . . .
>
> Wanner's credibility and honesty with the Bureau are crucial in a determination of his claim. In this case the nature of Wanner's injury involves assessments that are not readily subject to objective measurement. The amount of pain and Wanner's abilities are dependent in large measure upon his subjective report. If Wanner is willfully being dishonest with the Bureau it impairs the Bureau's ability to properly determine his claim.
>
> A failure to report income is by its very nature material to the Bureau's ability to determine a claimant's entitlement to benefits. *Unser v. North Dakota Workers Compensation Bureau*, 1999 ND 129 ¶ 18, 598 N.W.2d 89. A failure to report work activities similarly impedes the Bureau's process of determining eligibility. *Snyder v. North Dakota Workers Compensation Bureau*, 2001 ND 38 ¶ 18, 622 N.W.2d 712. While this Court agrees with Wanner and finds that the circumstances surrounding Wanner's false statements are not as egregious as those in *Unser, supra*, and *Snyder, supra*, the conclusion must still be the same. Wanner's false statements were sufficiently material to warrant the termination of future benefits and there

is sufficient evidence to support the Bureau's decision.

[¶ 53]   I would affirm.

[¶ 54] CAROL RONNING KAPSNER, J., concurs.